IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 4:18-CR-29-FL-1

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MONTE MARQUIS THORNE, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to suppress certain evidence allegedly obtained in violation of the Fourth Amendment to the United States Constitution. (DE 33, 36). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge Robert T. Numbers, Jr., entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motion be denied. (DE 60). Defendant timely objected to the M&R. In this posture, the issues raised are ripe for ruling. For the reasons that follow, defendant's motion to suppress is denied.

### STATEMENT OF THE CASE

On June 13, 2018, defendant was indicted for possession with intent to distribute 500 grams or more of cocaine and a quantity of cocaine base, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924.

On December 26, 2018, defendant filed the instant motion to suppress. Approximately one week later, defendant filed an amendment to his motion to suppress. Defendant initially advanced four arguments in favor of suppression: 1) that his consent to search his home was not voluntary,

2) that, if he did consent, he withdrew that consent prior to discovery of any incriminating evidence, 3) he was unconstitutionally interrogated while in custody prior to being advised of his Miranda[1] rights, and 4) the search warrant procured by the police to search defendant's residence was not supported by a sworn affidavit. The government responded in opposition, arguing the court should reject each ground for suppression.

Evidentiary hearing was held before the magistrate judge on July 1, 2019. At hearing, defendant abandoned his claim that the search warrant procured by the police to search defendant's residence was not supported by an officer's affidavit, choosing to advance only his first three arguments for suppression. (Transcript of Hearing ("Tr.") (DE 59) 6:1–10). The court heard testimony from officers Joshua Thiele ("Thiele"), Jeremy Wendt ("Wendt"), and Sergeant Timothy Hathaway ("Hathaway"). Defendant presented exhibits, including the incident report describing events from the day in question, satellite photographs of defendant's residence, the search warrant obtained for defendant's home, and two declarations concerning the accuracy of Apple's "Find My iPhone" application. The government presented Hathaway's body camera footage from the date of the incident in question.[2]

On August 23, 2019, the magistrate judge issued M&R, finding that defendant voluntarily consented to the search of his home by Hathaway and Wendt, defendant never revoked his consent to the search, and that defendant never was subjected to custodial interrogation. Defendant raises numerous objections to the magistrate judge's finding that he voluntarily consented to a search of his house.[3]

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

[2]  **Error! Main Document Only.**All citations herein to the Body Camera Footage are to the time stamp in minutes and seconds (e.g., "00:00") appearing in the player on which the court viewed the video, VLC Media Player.

[3]  Defendant does not raise any objections to the findings in the M&R that he never revoked his consent, or that he was never subjected to custodial interrogation when he made certain incriminating statements to Hathaway and

## STATEMENT OF FACTS

On December 27, 2017, the Rocky Mount Police Department received a call from Cindy Knudsen ("Knudsen"), who believed that her iPhone had been stolen. (Tr. 8:8–9:3; Incident Report (Def. Ex. 1) at 1). Thiele met Knudsen at a local Chick-fil-A restaurant. (Tr. 8:14–18). Knudsen told Thiele that she believed she had lost her phone between the Chick-fil-A and a nearby Walmart store. (Tr. 8:16–18). Knudsen's niece, who was also present, used an application on her iPhone called "Find My iPhone" to track the missing phone. (Tr. 8:20–3, 9:17–21). The niece showed Thiele a map with a red pin and the address 1621 Cherry Street, which was in a different part of town. (See Tr. 7:18–21, 10:14–22, 24:10–22, 55:6–9). Thiele advised Wendt, an officer patrolling in the area of 1621 Cherry Street that, based upon the information from the Find My iPhone application, he suspected somebody took Knudsen's iPhone to that address. (See Tr. 11:14–25, 15:3–17). Thiele, along with Wendt and Hathaway, each testified that they or other officers they knew had previously used the Find My iPhone application to locate stolen phones and found it reliably tracked the location of those phones. (See Tr. 9:24–10:7, 55:23–56:25, 73:19–74:13, 94:10–14).

Responding to Thiele's call, Wendt traveled to 1621 Cherry Street to investigate. (Tr. 55:6–22, 57:1–10). Wendt initially knocked on the door facing Beckman Street, which appeared to be the front door of the residence, but no one answered. (Tr. 57:6–10). As Wendt started to walk back to his vehicle, defendant stepped out from a door on the Cherry Street side of the house. (Tr. 57:11–58:4). Wendt told defendant that he was investigating a stolen iPhone and that the phone was pinging to his address. (Tr. 58:10–15). Defendant denied knowing about the phone.

---

Wendt. (See M&R (DE 60) at 14–20). Upon careful review of the record, court finds no clear error as to those portions of the M&R. See 28 U.S.C. § 636(b). The court conducts its de novo review only with respect to the voluntariness of defendant's consent.

3

(Tr. 58:17–21). With defendant's permission, Wendt searched defendant's yard but was unable to find Knudsen's iPhone. (Tr. 58:21–60:21). While Wendt was searching the yard, he noticed a female exit the residence. (Tr. 60:1–4). Not knowing how many individuals might be in the home, Wendt called for another officer. (See Tr. 59:1–4, 81:18–82:16).

Approximately 15 to 20 minutes after Wendt first arrived at 1621 Cherry Street, Hathaway arrived. (Tr. 60:21–23, 80:18–20). The two officers approached defendant, who told them that he had been home all day with a female friend and did not know anything about the missing iPhone. (Body Camera Footage (Gov. Ex. 1) 0:34–1:15). After some back and forth, Hathaway told defendant "we got enough to do a search warrant," he asked defendant for permission to search the home, and he said "otherwise we're going to have to do a search warrant." (Tr. 92:18–21; Body Camera Footage (Gov. Ex. 1) 2:07–2:20). Defendant continued to deny that the iPhone was in his house, and Hathaway reiterated they needed to search based upon the Find My iPhone result. (Body Camera Footage (Gov. Ex. 1) 2:20–3:11). Hathaway explained that he was not interested in anything else that he may have in the house. (Body Camera Footage (Gov. Ex. 1) 3:01–3:02). After again denying that he knew anything about the phone, defendant told Hathaway and Wendt that they could come in and look for the iPhone. (Body Camera Footage (Gov. Ex. 1) 3:03–3:13).

Once inside the house, Hathaway used his department issued cell phone to call Knudsen's iPhone, and used his flashlight to look around a darkened room for the iPhone. (Tr. 99:23–100:9; see Body Camera Footage (Gov. Ex. 1) 4:00–4:20). While looking around the room for the iPhone, Hathaway noticed digital scales and white powdery substance, which in his experience and training indicated the sale or packaging of narcotics. (Tr. 100:21–101:5). Following this discovery, Hathaway asked defendant if he had anything else besides the scales. (Tr. 105:6–8, Body Camera Footage (Gov. Ex. 1) 5:52–6:00). After further questioning, defendant admitted to other

4

contraband.  (See Tr. 109:5–9, 110:4–6, 110:15–17; Body Camera Footage (Gov. Ex. 1) 6:18–23, 7:25–8:25, 10:25–10:40, 11:00–11:08).  Thereafter, the officers obtained a search warrant, searched the house, and found almost 650 grams of cocaine.  (See Search Warrant (Def. Ex. 3)).  The officers did not locate Knudsen's iPhone.

Additional facts pertinent to the instant motion will be discussed below.

## DISCUSSION

A.   Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed.  28 U.S.C. § 636(b).  The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations."  Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).  Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R.  Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983).  Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

B.   Analysis

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "[S]earches conducted outside the judicial process . . . are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967).  "[A] search conducted pursuant to a valid consent is

5

constitutionally permissible" where "the consent was, in fact, freely and voluntarily given." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (internal citations omitted). "Voluntariness is a question of fact to be determined from all the circumstances," including "the characteristics of the accused . . . as well as the conditions under which the consent to search was given." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (en banc); see United States v. Mitchell, 209 F.3d 319, 324 (4th Cir. 2000) (holding consent voluntary where defendant consented only a few minutes after arrest). "[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." Schneckloth, 412 U.S. at 248–49.

Hathaway's conversation with defendant regarding entering the house lasted only a few minutes. (See Body Camera Footage (Gov. Ex. 1) 0:34–3:13). There were only two officers present. (See Tr. 61:15–24). Neither officer raised their voice, drew their weapons, represented they already had a search warrant, or restrained defendant in any way. (Tr. 62:4–22, 63:8–12, 95:3–13). Though defendant was never explicitly told that he could refuse consent, defendant resisted Hathaway's initial requests to search the home before inviting the officers into his home. (See Body Camera Footage (Gov. Ex. 1) 2:07–3:13). The record does not indicate that defendant was impaired in his interactions with the officers. (See Body Camera Footage (Gov. Ex. 1) 2:07–3:13). Based on the totality of the circumstances, the evidence of record demonstrates that the consent given by defendant to search his home was voluntary.

Defendant argues that his consent was not voluntary for two reasons. First, he claims that he only consented to searching the house for the phone, relying on Hathaway's claim that he did not care about anything else in the house besides the phone. (Body Camera Footage (Gov. Ex. 1) 3:01–3:02); see Fla. v. Jimeno, 500 U.S. 248, 251 (1991) ("The scope of a search is generally

6

defined by its expressed object."). Defendant further argues that Hathaway intended to exceed the scope of the search when he made the statement that he was only interested in the phone, because he was not looking for the phone but was looking for other contraband. (Pl. Obj. (DE 65) at 4, 7).

Defendant's first argument is unpersuasive. The record does not indicate Hathaway intended to search for anything other than the iPhone prior to discovering the digital scales and white powdery substance. Hathaway did not know anybody at 1621 Cherry Street, and was merely responding to assist Wendt, who was looking for the iPhone. (Tr. 58:6–25, 114:13–23). Hathaway explained to defendant that they were searching for an iPhone that had been traced to defendant's location. (Tr. 92:15–21, 117:24–118:8). Once inside the house, Hathaway attempted to call the iPhone, and used his flashlight to look around a darkened room for the iPhone.[4] (Tr. 99:23–100:9; see Body Camera Footage (Gov. Ex. 1) 4:00–4:20). While looking around the room for the iPhone, Hathaway noticed the digital scales and white powdery substance. (Tr. 100:21–101:1). Accordingly, Hathaway's statement was not intended to coerce plaintiff. Cf. United States v. Boone, 245 F.3d 352, 364 (4th Cir. 2001) (holding contraband discovered in plain view during an officer's limited consent search does not exceed the scope of the search).

Second, defendant argues that his consent was not voluntary because Hathaway told him that the police had "enough to do a search warrant," and that defendant could either consent or the police were "going to have to do a search warrant." (Tr. 92:18–21; Body Camera Footage (Gov. Ex. 1) 2:07–2:20). "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search," amounting to coercion. Bumper v. North Carolina, 391 U.S. 543, 550 (1968) (holding involuntary consent

---

[4] Defendant's suggestion that use of a flashlight indicates Hathaway was searching for something other than a phone runs contrary to common sense. It unreasonable to expect that an officer, or any other person, would rely solely on the light or sound that might be generated from the phone being powered on and receiving a call to locate the phone.

obtained by declaring the officers had a search warrant); Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001). However, "[t]he fact that a search warrant was mentioned does not necessarily constitute a coercive factor negating consent." United States v. Hummer, 916 F.2d 186, 190 (4th Cir. 1990), abrogated on other grounds by Koon v. United States, 518 U.S. 81, 100 (1996) (internal quotations omitted).

The United States Court of Appeals for the Fourth Circuit has not expressly addressed when the choice between consent or search warrant becomes coercive. A review of the court's decisions indicates that consent to search given based on an unlawful assertion of probable cause violates the Fourth Amendment. See Lattimore, 87 F.3d at 652 (noting in dicta that, where an officer lacked reasonable suspicion to search an automobile, an officer's assertion that he would "call a drug dog" to search the automobile if defendant refused written consent would raise "serious questions" concerning voluntariness); United States v. Saafir, 754 F.3d 262, 266 (4th Cir. 2014) (holding an officer's false assertion that the existence of the hip flask provided him with probable cause to search defendant's car violated the Fourth Amendment and tainted the subsequent search of the car). Conversely, an assertion that an officer will seek a warrant if a defendant does not consent is not coercive where the officer has probable cause to search. See United States v. Aguebor, 166 F.3d 1210 (4th Cir. 1999) (per curiam) (finding after a positive drug dog alert that consent to an X-ray search was voluntary when customs officials informed defendant that if he did not consent, he would be detained until a court order could be obtained authorizing the search).

Probable cause means that, based on the totality of the facts and circumstances known to the officer, a reasonable person would conclude "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238

8

(1983). Relevant considerations include the "veracity" and "basis of knowledge" of a source of information. United States v. Doyle, 650 F.3d 460, 472 (4th Cir. 2011).

Turning first to what the officers knew, the court considers whether a reasonable person would rely upon the output from the "Find My iPhone" application, which indicated Knudsen's iPhone was located at 1621 Cherry Street, to determine the phone's location. "[W]hen a user activates the GPS on . . . a phone, a provider is able to monitor the phone's location and speed of movement." United States v. Jones, 565 U.S. 400, 428–29 (2012) (Alito, J., concurring). "[I]n assessing the Fourth Amendment constraints associated with GPS tracking, courts generally have assumed the technology's accuracy." United States v. Brooks, 715 F.3d 1069, 1078 (8th Cir. 2013) (collecting cases); see In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel., 849 F.Supp.2d 526, 533 (D.Md.2011) ("[C]urrent GPS technology would almost certainly enable law enforcement to locate the subject cellular telephone with a significantly greater degree of accuracy—possibly within ten meters or less."). At least one district court has found probable cause based on the GPS technology relied upon by Find My iPhone. See United States v. Rivera, 234 F. Supp. 3d 346, 352–53 (D.P.R. 2017). Similarly, all three officers in the instant case testified that they or other officers had previously found the GPS tracking technology used by Find My iPhone to be reliable. (See Tr. 9:24–10:7, 55:23–56:25, 73:19–74:13, 94:10–14).

Defendant challenges the accuracy of the Find My iPhone application, relying on evidence of specific instances in which Apple devices were not correctly located. (See Tr. 47:19–48:13; Arnold Decl. (Def. Ex. 5) ¶¶ 4–6). Defendant also relies upon evidence from Apple's website, where the company disclaims that "[t]hese services . . . may not be available in all geographic areas, resulting in inaccurate of incomplete maps or location information." (Flatley Decl. (Def.

Ex. 4) ¶ 4, Ex. A). Finally, defendant argues Rivera is distinguishable from the instant case. Where the application of GPS technology is broadly recognized by the courts as reliable, and where the officers in this case have testified that they or other officers they knew have previously relied on Find My iPhone to locate lost or stolen phones, a reasonable person would conclude Knudsen's iPhone was located at 1621 Cherry Street. See Fla. v. Harris, 568 U.S. 237, 244 (2013) (quoting Gates, 462 U.S. at 238) ("'All we have required is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'").

The second part of the probable cause inquiry turns on the contours of the offense in question. Under North Carolina law, a larceny occurs if a person "(a) took the property of another; (b) carried it away; (c) without the owner's consent; and (d) with the intent to deprive the owner of his property permanently." State v. Jones, 369 N.C. 631, 633 (2017). The evidence shows that Knudsen called the police and told them that she lost her phone somewhere between Walmart and Chick-fil-A in the northern part of Rocky Mount. (See Tr. 7:18–21, 8:1–20). Knudsen attempted to locate her phone but was unsuccessful. (See Tr. 8:10–13, 9:1–2). After Knudsen's niece used the Find My iPhone application, Thiele determined that the iPhone was pinging from 1621 Cherry Street in the eastern part of Rocky Mount. (See Tr. 8:20–9:3, 9:10–21, 10:11–22, 11:17–25). These facts provide probable cause that a larceny had occurred. See Jones, 369 N.C. at 634 ("Here, it is beyond dispute that defendant carried property away, and that—assuming the property did not belong to him—he did so with the intent to permanently deprive the owner of the property, and without the owner's consent.").

Defendant argues that felonious intent cannot be inferred from the known facts and circumstances. (Pl. Obj. (DE 65) at 13 (citing Jones, 369 N.C. at 638 (Newby, J., concurring); State v. Roper, 14 N.C. 473, 474–75 (1832) (opinion of Daniel, J.)). "To constitute the crime of

larceny, there must be an original, felonious intent, general or special, at the time of the taking." State v. Holder, 188 N.C. 561, 563 (1924). The Roper case on which defendant relies holds that "if goods were lost by the owner, and found by another, and the taking was bona fide, and not under a mere pretence of finding , . . . it will not be a larceny." Roper, 14 N.C. at 474. Defendant overlooks a key phrase in the court's holding: "the taking was bona fide, and not under a mere pretence of finding." Id.; State v. Davis, 4 N.C. 271, 272 (1815) ("[T]he person taking the property must really believe it to be lost, for if he do not, and take it with the intent to steal, he will not be excused by the pretext of finding, otherwise every felony would be so excused."). The North Carolina Supreme Court has held "[t]he omission to use the ordinary and well-known means of discovering the owner of goods lost and found raises a presumption of fraudulent intention." State v. Arkle, 116 N.C. 1017, 1031 (1895) (internal citation omitted); see Holder, 188 N.C. at 563.

Here, the record supports a presumption of fraudulent intention. The facts known to Thiele were that Knudsen's phone went missing somewhere around the Chick-fil-A and Walmart in northern Rocky Mount and ended up at 1621 Cherry Street in eastern Rocky Mount within 30 to 40 minutes of Knudsen losing her phone. (Tr. 7:10–15, 8:24–9:3, 9:17–21, 11:17–25). The record is devoid of any evidence that whoever took the phone used ordinary and well-known means to identify Knudsen as the owner of the phone. The significant distance between Knudsen and the location given by Find My iPhone, coupled with the short time in which it took for her phone to get there, belie defendant's assertion that whoever took the phone really believed it to be lost.

For the reasons discussed by the court above, the officers had probable cause to believe that someone stole Knudsen's phone, and that the phone was located at 1621 Cherry Street. Therefore, Hathaway's assertion to defendant that he could consent to a search of his residence for the phone or that the police would seek a search warrant was not coercive. Defendant voluntarily

11

allowed Hathaway and Wendt into his home to search for Knudsen's iPhone. Therefore, no violation of the Fourth Amendment has occurred, and no suppression of the evidence is warranted.

## CONCLUSION

Based on the foregoing, upon de novo review of those portions of the M&R to which specific objections were raised, and considered review of the remainder thereof, the court DENIES defendant's motion to suppress. (DE 33, 36). An order scheduling arraignment will follow.

SO ORDERED, this the 30th day of October, 2019.

LOUISE W. FLANAGAN
United States District Judge